# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

VICTOR A. STONE,                              6:14-CV-01537-AC

        Plaintiff,                        **FINDINGS AND**
                                              **RECOMMENDATION**
v.

CAROLYN W. COLVIN,
Commissioner, Social Security
Administration,

        Defendant.


**ACOSTA, Magistrate Judge.**

    Plaintiff Victor A. Stone ("Stone") seeks judicial review of a final decision of the

Commissioner of the Social Security Administration ("SSA") in which she denied Plaintiff's

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This

court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).


1- FINDINGS AND RECOMMENDATION

Following a review of the record, the court finds the decision of the Commissioner is supported by substantial evidence in the record . Therefore the ALJ's decision should be affirmed.

## ADMINISTRATIVE HISTORY

Plaintiff filed his application for DIB on August 27, 2008, and alleged a disability onset date of June 3, 2008, due to "[o]ld workers comp injuries...on my lower back, my neck, and right arm and shoulder." Tr. 26.[1] The application was denied initially and on reconsideration. An Administrative Law Judge ("ALJ") held a hearing on September 14, 2010. Tr. 103-40. At the hearing Plaintiff was represented by an attorney. Plaintiff and a vocational expert ("VE") testified.

The ALJ issued a decision on October 27, 2010, in which he found Plaintiff was not disabled. Tr. 146-57.   Plaintiff requested review of the decision which the Appeals Council granted, remanding to address evidence from Goodwill Industries, to reconsider the residual functional capacity, and to obtain supplemental vocational testimony. Tr. 164-65.

A second hearing was held on December 12, 2012. Tr. 62-102. On January 16, 2013, the ALJ issued a decision denying Plaintiff's claim for benefits. Tr. 18-38. That decision became the final decision of the Commissioner on July 29, 2014, when the Appeals Council denied Plaintiff's request for review. Tr. 1-6.

On September 26, 2014, Plaintiff filed a complaint in this court seeking review of the Commissioner's decision.

---

[1] Citations to the official transcript of record filed by the Commissioner on March 19, 2015, are referred to as "Tr."

## BACKGROUND

Plaintiff was 48 years old at the time of the first hearing and 50 years old at the time of the second hearing. Tr. 69, 108. He is a high school graduate with one year of apprenticeship training as an electrician. *Id.* He has worked as a light fixture servicer and in merchandise delivery. Tr. 130-31.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). To meet this burden, a claimant must demonstrate her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)(quoting *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). *See also Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Molina*, 674 F.3d. at 1110-11 (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)). It is more than a mere scintilla [of evidence] but less than a preponderance. *Id.* (citing *Valentine*, 574 F.3d at 690).

The ALJ is responsible for determining credibility, resolving conflicts in the medical

evidence, and resolving ambiguities. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The court may not substitute its judgment for that of the Commissioner. *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

## **DISABILTY EVALUATION**

At Step One the claimant is not disabled if the Commissioner determines the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(I). *See also Keyser v. Comm'r of Soc. Sec.*, 648 F.3d 721, 724 (9th Cir. 2011).

At Step Two the claimant is not disabled if the Commissioner determines the claimant does not have any medically severe impairment or combination of impairments. 20 C.F.R. § 416.920(a)(4)(ii). *See also Keyser*, 648 F.3d at 724.

At Step Three the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal one of the listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii). *See also Keyser*, 648 F.3d at 724. The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1 ("Listed Impairments").

If the Commissioner proceeds beyond Step Three, she must assess the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his

limitations. 20 C.F.R. § 416.920(e). *See also* Social Security Ruling (SSR) 96-8p. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule." SSR 96-8p, at *1. In other words, the Social Security Act does not require complete incapacity to be disabled. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234-35 (9th Cir. 2011)(citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

At Step Four the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work she has done in the past. 20 C.F.R. § 416.920(a)(4)(iv). *See also Keyser*, 648 F.3d at 724.

If the Commissioner reaches Step Five, she must determine whether the claimant is able to do any other work that exists in the national economy. 20 C.F.R. § 416.920(a)(4)(v). *See also Keyser*, 648 F.3d at 724-25. Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can perform. *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010). The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2. If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 416.920(g)(1).

## <u>ALJ'S FINDINGS</u>

At Step One the ALJ found Plaintiff has not engaged in substantial gainful activity since his June 3, 2008, alleged onset date. Tr. 23. His date last insured is December 31, 2013.

At Step Two the ALJ found Plaintiff has severe impairments of degenerative disc disease of the cervical spine status post cervical spine fusion, mild degenerative disc disease of the thoracic and lumbar spine, fibromyalgia, status post right rotator cuff repair, status post bilateral foot arthrodesis,

and mild carpal tunnel syndrome. *Id.*

At Step Three the ALJ determined Plaintiff's impairments did not equal in severity a listed impairment, and found Plaintiff retained the RFC to perform a modified range of light work. He can lift and carry up to 20 pounds occasionally and up to ten pounds continuously. He can sit up to six hours without interruption, in an eight hour workday, and stand for three hours at a time, for up to six hours in a workday. He can walk up to one hour at a time up to three hours in a workday. He can continuously reach, handle, finger, feel, push or pull with his upper extremities, and continuously use foot controls with both his lower extremities. He can frequently to continuously climb and stoop. He can frequently balance. He can occasionally kneel, crouch or crawl He can only be occasionally exposed to heavy machinery. He can continuously be exposed to unprotected heights, moving mechanical parts, operating motor vehicle, humidity and wetness, pulmonary irritants, extreme temperatures, and vibration. Tr. 25.

At Step Four, the ALJ found Plaintiff was unable to perform his past relevant work as a light fixture servicer and deliverer of merchandise. Tr. 130-31..

At Step Five, the ALJ found Plaintiff was capable of performing other work, including photocopying machine operator, office helper, and mail clerk. Tr. 31.

## THE MEDICAL EVIDENCE AND TESTIMONY

### I. The Medical Record

In 2005, Plaintiff had a cervical discectomy and fusion to repair a herniated disc with radiculopathy. Tr. 334. He did well and returned to work. Tr. 343.

In 2006, Plaintiff had an arthroscopic rotator cuff repair, decompression, and debridement of a rotator cuff tear in the right shoulder. Tr. 335.

6- FINDINGS AND RECOMMENDATION

In July 2007 Plaintiff reported acute left side neck pain and headaches for the past five months. Tr. 342. Neurosurgeon Stephen McGirr, M.D., found a restricted range of motion, and reviewed an MRI which showed no significant disc herniation, and no cervical, lateral or foraminal canal intrusion. *Id.* Dr. McGirr wrote "However, there is significant arthritis affecting the left C3-4 facet joint. The critical significance is not certain, but it is conceivable that his neck pain originates with the arthritic change at this joint." *Id.* Dr. McGirr sent Plaintiff for a facet block and had "very good relief" for one week, after which "significant" symptoms returned. Tr. 341. Dr. McGirr referred Plaintiff back to Dr. Dunn for another facet joint block. *Id.*

In January 2008, Plaintiff was examined by Donald C. Jones, M.D., an orthopedic surgeon, for ankle problems. Tr. 354. Plaintiff had a history of talonavicular joint arthrodesis. *Id.* Dr. Jones recommended an injection. Tr. 355.

In May, 2008, Plaintiff told Arthur Willey, M.D., his primary care physician, that he had left-sided neck pain for the past five to six weeks. Tr. 420. He feared his bulging disc was returning. Dr. Willey diagnosed cervical radiculitis and prescribed Midrin. *Id.*

In June, 2008, Joseph Dunn, M.D., a pain specialist, examined Plaintiff for neck pain radiating into both arms, with tingling and numbness in the index finger of the right hand. Tr. 386. Plaintiff had temporary relief from injections. He had a radio frequency ablation procedure in 2007, with good relief, but the pain returned about two months ago. *Id.* Dr. Dunn noted a component of myofascial pain, as well as tenderness to palpation over the occipital region that may be consistent with occipital neuralgia as well as a probable component from his recurrent facet pain. Tr. 389. An MRI showed interval worsening of the disc disease at C3-4 with left C4 nerve root entry zone narrowing as well as C3-4 foraminal narrowing, worse on the left. Tr. 391. On June 18, 2008, Dr.

7- FINDINGS AND RECOMMENDATION

Dunn injected an epidural steroid without much benefit. Tr. 393, 422. The following week, Plaintiff reported episodes of mid and lower back pain. Tr. 422. He was about to lose his health insurance, and Dr. Willey diagnosed a thoracic sprain. Tr. 423.

In June 2008 Plaintiff was laid off from work after 16 years. Tr. 485. He filed the applications at issue here on August 27, 2008, alleging disability as of June 3, 2008. Tr. 231-32.

On October 21, 2008, Plaintiff reported worsening low back pain, with numbness and tingling into both arms. Tr. 426. Pain interfered with sleep, and any prolonged positioning of his arms was painful. Dr. Willey stopped Plaintiff's Vicodin and prescribed Norco and Nerontin, noting Plaintiff would go back to see a neurosurgeon "when insurance allows and consider possible surgical intervention. In the meantime, he is not able to work." *Id.*

In January, 2009, Plaintiff reported worsening low back pain. Tr. 428. He had a significant improvement of his neck pain on Gabapentin, but appeared tired and "in obvious pain with movement." *Id.* Plaintiff was taking Neurontin, Flexeril, Norco, and ibuprofen. A February 2009 MRI showed right foraminal and disc bulging at L3-4 and L4-5. Tr. 430. A March 2009 MRI showed mild posterior disc bulging at T7-8 with minor ventral cord flattening, with no spinal stenosis or foraminal narrowing. Tr. 450.

On April 13, 2009, Dr. McGirr saw Plaintiff for significant neck pain and headaches, with bilateral left worse than right median distribution hand numbness. Tr. 453. Dr. McGirr ordered a nerve conduction study, which showed carpal tunnel syndrome on the left. Tr. 452. Plaintiff was able to tolerate the numbness.

In June 2009 Plaintiff had right elbow pain and Dr. Willey diagnosed lateral epicondylitis. Tr. 445. By September, Plaintiff reported arm pain for the past two months, left worse than right.

8- FINDINGS AND RECOMMENDATION

Neurological testing showed carpal tunnel syndrome on the left, and Dr. Willey diagnosed cervical radiculitis, carpal tunnel syndrome, and lateral epicondylitis. Tr. 443-44.

In July 2009 Dr. Willey responded to questions from Plaintiff's counsel, stating that Plaintiff had diagnoses of cervical radiculitis, carpal tunnel syndrome, and lateral epicondylitis. Tr. 438. Plaintiff had a positive Phelan's test that was moderately subjective, but consistent with nerve conduction findings. *Id.* He had a left lateral epicondylar tenderness exacerbated with grip. While there was a subjective component to this, it represented at least a potential lateral epicondylitis. *Id.* Dr. Willey had referred Plaintiff back to Dr. McGirr, noting that he was unable to do consistent work involving "any repetitive lifting, gripping or reaching," and required medications that limit concentration and the safety of operating equipment. Tr. 438.

On December 14, 2009, Plaintiff saw Dr. McGirr for low back pain. Tr. 451. Dr. McGirr reviewed a February 2009 lumbar MRI which showed "mild right-sided facet joint diastases. In my opinion, there is minimal disk disease at any of the studied levels. Nothing at any level would be construed as surgically correctable." *Id.* Dr. McGirr advised Plaintiff there was "no correlation between these minimal imaging changes and the degree of back pain that he is suffering." *Id.*

On January 14, 2010, Plaintiff saw Joseph S. Dunn, M.D., for a pain consultation regarding neck, mid back and low pain. Tr. 459-63. Plaintiff reported low back pain radiating to the left lateral thigh, with intermittent numbness and tingling in the thigh. Tr. 459. Plaintiff used a cane intermittently. Plaintiff reported decreased neck and left forearm pain since his C6-7 fusion. He was taking Norco, Neurontin, Flexeril and Soma, but the pain was usually 9/10, as high as 10/10, and as low as 6/10. Pain increased with sitting, standing, walking, stress, morning time, night time, fatigue, cold weather, bending forward, bending backward, sneezing, and work. It is decreased by sitting,

pain pills, and hot tub. Plaintiff was not employed. Plaintiff reported feeling fevers, sweats, feeling tired with low energy, problems going to sleep, problems staying asleep, and being awakened by pain. Tr. 460. Dr. Dunn noted no excessive pain behavior. Tr. 461. He noted a positive Patrick sign in the left lower extremity, and hip pain with FABER. Tr. 462. There was tenderness to palpation at the left sacroiliac joint line and trigger point tenderness longissimus on the left. *Id.* Dr. Dunn described Plaintiff as having chronic intractable pain with lumbar or thoracic radiculopathy, sacroiliitis, lumbar and cervical spondylosis, and myofascial pain. Tr. 462-63. He offered a left sacroiliac joint injection and administered the injection the following week. Tr. 458.

On February 11, 2010, Plaintiff reported 30% relief of pain from the injection. Tr. 471. Dr. Dunn administered a left L4-5 and L5-S1 epidural steroid injection. *Id.*

On February 12, 2010, Plaintiff reported continuing back and neck pain, and the recent injections had not helped. Tr. 441. Dr. Willey approved medical marijuana. *Id.* On March 4, Plaintiff reported to Dr. Dunn no relief from the last injection, continued tingling into his legs, and Dr. Dunn administered an epidural steroid injection at L3-4 and trigger point injections into the iliocostalis. Tr. 465. Dr. Dunn noted no excessive pain behavior. Tr. 466.

On July 1, 2010, Dr. Willey diagnosed low back pain and muscle spasm, and prescribed Baclofen. Tr. 480. He gave Plaintiff written work restrictions of no lifting over 20 pounds, no repetitive bending at the waist, and no bending to lift. *Id.*

On August 31, 2010, Christina Karcher, a physical therapist, completed a Functional Capacity Evaluation of Plaintiff. Tr. 485-91. In a report dated September 8, 2010, Ms. Karcher noted Plaintiff had high subjective pain reporting throughout the evaluation. Tr. 491. He had a decreased range of motion in the cervical and lumbar spine. Strength testing showed some

inconsistency with regard to functional leg strength. *Id.* Ms. Karcher noted Plaintiff "does demonstrate some magnification behavior." *Id.* Ms. Karcher concluded it was difficult to set specific work limitations as Plaintiff's functional tolerance was primarily limited by subjective pain reporting. *Id.* He had not taken his usual pain medication so she did not know what he would be capable of doing with better pain control. *Id.* She concluded Plaintiff had general deconditioning, high pain reporting, and spine range of motion loss that limited his functional ability. Ms. Karcher recommended limiting Plaintiff to sedentary-light work. *Id.*

In September 2010, Dr. Willey responded to questions from Plaintiff's counsel. Tr. 482-83. Dr. Willey said that because "of the multiplicity exacerbating positions or and activities [Plaintiff] is unable to work." Tr. 482. Dr. Willey stated that exacerbating factors included bending at the waist, carrying, lifting, pushing, pulling, reaching above shoulder level, prolonged standing, and walking. *Id.* Dr. Willey concluded:

> As above, I do not believe he would be able to function in a place setting with the requirement for prolonged positioning and activities. He needs to be able to lie down for periods of time and use treatment modalities such as the tens unit heat or ice. He would most definitely not be able to return to the kind of heavy physical work that he has previously done.

*Id.*

On October 4, 2010, Plaintiff began a Situation Work Assessment at Goodwill Industries, by Kevin White, Assessment Specialist. Tr. 495-98. The Assessment was a 20-day situational work assessment to determine Plaintiff's ability to work competitively in the community and determine work strengths and barriers. Tr. 495. He began on October 4 and ended on October 11 by mutual agreement. Tr. 496. Plaintiff missed two days due to pain issues. *Id.* Plaintiff worked four-hour

11- FINDINGS AND RECOMMENDATION

shifts. After three days he missed two days of work, and his doctor prescribed morphine sulfate, which allowed him to return to work. Tr. 497. Plaintiff attempted light retail and light production work, and was then offered the opportunity to work in the Job Search Center performing cold calling and packet assembly, which are sedentary jobs. Plaintiff declined. He felt his temper was not compatible with cold calling and "he was in too much pain to continue with the other tasks or the assessment itself." Tr. 496. Plaintiff completed a pain inventory and reported increased pain in his upper left back, lower back, and left forearm. Tr. 497. "Staff observations tended to support this conclusion in that both his movements [and] facial expressions reflected someone who is experiencing pain." *Id.* Because Plaintiff refused to attempt any sedentary work, Mr. White was unable to determine whether he was physically capable of sedentary work. *Id.* Mr. White concluded that because "of his multiple physical issues including back, shoulder, arm and wrist pain, [Plaintiff] demonstrated that he is not currently ready for competitive employment." *Id.* Mr White noted that Plaintiff was pursuing a SSI claim and concluded that "from the results of this assessment that is probably his best course of action at this time." *Id.*

On September 14, 2010, a hearing was held before ALJ John Madden, Jr. Tr. 103. On October 27, 2010, the ALJ issued a decision denying Plaintiff's claim for benefits. Tr. 143-62.

In February 2011, Plaintiff was examined by orthopedist Donald C. Jones, M.D., for complaints of left foot pain. Plaintiff had constant pain laterally, but got a sharp pain laterally, that "almost drops him to his knees," when he walks on uneven ground. Tr. 502. The sharp pain occurred occasionally even on level ground. Plaintiff was taking Carvedilol, Gemfibrozil, Neurontin, Lisinopril, Norco, Morphine Sulfate, Niacin, and Flexeril. *Id.* Dr. Jones examined x-rays and found radiographic evidence of talonavicular joint arthritic change as well as possible

subtalar and calcaneocuboid joint change. Tr. 504. Dr. Jones recommended a CT scan, which was done on February 22, 2011. Tr. 506. The scan revealed marked subtalar joint arthritis, marked talonavicular joint arthritis, and calcaneocuboid joint arthritis. Tr. 554.

On March 24, 2011, Plaintiff had a triple arthodesis of the left foot, with bone graft from his tibia. Tr. 551. Postoperative diagnoses were osteoarthritis talonavicular, calcaneocuboid, and subtalar joints, and ligamentous instability of left ankle. *Id.* On May 20, Plaintiff was seen for left foot pain after working on the side of a hill, landscaping. Tr. 545. He was put into a short walking cast.

On July 7, 2011, Dr. Willey wrote Plaintiff's counsel "to include fibromyalgia to [Plaintiff's] list of medical diagnoses." Tr. 501. Dr. Willey stated fibromyalgia "does pose an added barrier towards his ability to return to the work place." *Id.*

On July 29, 2011, Dr. Jones advised Plaintiff to begin weaning himself from the ankle boot. Tr. 541. In September 2011, Dr. Willey discussed fibromyalgia treatment options with Plaintiff, noting chronic back pain had been helped by injections in the past, but which Plaintiff could no longer afford. Tr. 564. Plaintiff complained of memory loss and feeling foggy, and they discussed the possible link to Gabapentin. Dr. Willey noted Plaintiff was tired, uncomfortable, and in obvious pain, having to change position frequently. *Id.* He prescribed Cymbalta. Tr. 565.

In October, 2011, Plaintiff began treatment with Lisa Albanese, M.D., a physiatrist, for evaluation of chronic pain. Tr. 594-97. Plaintiff reported pain in his low back, radiating to his left leg, worse with standing, sitting, lifting and twisting. Tr. 594. Plaintiff reported some leg weakness, and numbness radiating down his left leg to just above the knee. Pain ranged from 2-3 on a good day to 7 or 8 on a bad day. *Id.* He described it as a deep, dull, cramping. He had upper back pain

13- FINDINGS AND RECOMMENDATION

radiating to the second, third, and fourth digit. Plaintiff reported "occasional" spasms, better with Cymbalta and MS Contin, and trouble sleeping.

Plaintiff reported recent headaches and dizziness, nausea, and difficulty walking. Tr. 595. He had joint pain, stiffness, and weakness. *Id.* Dr. Albanese noted Plaintiff "sits comfortably on the exam table. Moves about the exam room without difficulty." Tr. 596. She also noted [n]o pain behaviors." *Id.* Range of motion in the lumbar spine was limited to 90 degrees, strength was "slightly diminished" in left hip flexion. *Id.* Plaintiff's gait was nonantalgic. Dr. Albanese ordered a lumbar MRI to evaluate possible nerve root compromise, and recommended a back health program or physical therapy, which Plaintiff could not afford.

The MRI showed that all of Plaintiff's lower thoracic and lumbar disc spaces remained normal in signal and height. Tr. 599. Compared to Plaintiff's February 2009 MRI, there were "stable very mild degenerative endplate irregularities with anterior disc bulges and/or osteophytes at several levels of the lower thoracic and lumbar spine. There was a stable "very small" right foraminal disc bulge at the L4-5 level that did not result in significant mass effect on the right L4 nerve root. No new large disc herniations, osteophytes or significant canal, foraminal or lateral recess stenosis was identified.

On December 12, 2011, Dr. Albanese reviewed the MRI, noting minimal L4-5 foraminal disc bulge which did not encroach on any nerve roots. Tr. 591. The doctor discussed treatment strategies, including physical therapy, trigger point injections, and home exercises, "however the patient shows very little interest in pursuing any of the discussed measures in the office today." Tr. 592. Plaintiff wanted to continue his medications without monthly follow up by the doctor due to financial issues. Dr. Albanese noted the patient "is not willing to undergo treatments suggested or

comply with this clinic's policies.... I am somewhat concerned of opiod-induced apathy and he may require titration down of his medications.... He would significantly benefit from initiating lifestyle changes of which he displayed no interest whatsoever in the office today." *Id.*

On January 12, 2012, Dr. Albanese noted Plaintiff was walking about three miles three times a week. Tr. 588. Plaintiff felt his medication was not working as well, and was interested in physical therapy. Dr. Albanese noted his mood was better and he was engaged in life. She referred him to physical therapy.

On March 12, 2012, Dr. Albanese noted Plaintiff was using the TENS unit, which helped "somewhat." Tr. 584. He had increased pain in the low back, which Plaintiff attributed to his increased activity in woodworking. He was building a bench. Plaintiff complained of fatigue and depression. Tr. 585. He walked stiffly, and there were no pain behaviors. *Id.* Strength in both lower extremities was 5/5, unchanged, with a minimal decrease in left hip flexion, also unchanged.

On March 23 Dr. Willey noted acute exacerbation of back pain while sleeping, a stabbing pain that lasted about an hour. Tr. 559. Dr. Willey stated Plaintiff had "ongoing limitation of physical abilities that make him unable to return to his customary employment and the need for potentially sedating analgesics makes most workplaces not a realistic option." Tr. 560.

On April 14, 2012, Dr. Willey wrote that Plaintiff has a "combination of painful musculoskeletal problems that render unable to return to gainful employment." Tr. 520. Dr. Willey opined that "[w]ith the combination of activity-limiting pain, and the required medications to attempt to deal with it, [Plaintiff] is in my opinion permanently medically disabled."

On May 14, 2012, Plaintiff reported increasing midback pain to Dr. Albanese, with two episodes of sharp stabbing pain radiating to his abdomen. Tr. 581. He was not doing his home

exercise program. Dr. Albanese "strongly recommend[ed]" a daily exercise regime. Tr. 582. She discontinued Flexeril and prescribed Tizanidine. An x-ray of the sacroiliac joint was normal. Tr. 585.

On June 12, 2012, Dr. Albanese noted Plaintiff was "doing about the same." Tr. 578. He walked three to four times a week, two to three miles at a time. *Id.* Dr. Albanese administered a trigger point injection. Tr. 579. On June 27 Dr. Albanese noted "some relief" from injection, and administered additional trigger point injections. Tr. 576.

On August 7 Plaintiff was examined by DeWayde C. Perry, M.D., at the request of the agency. Tr. 521-25. He reviewed Dr. Dunn's June 2008 records. Plaintiff reported he did some of the cooking and washed dishes. Tr. 521. He did some yard work such as weeding and planting, and mowed his mother's lawn with a riding mower. Tr. 521. Dr. Perry noted Plaintiff appeared uncomfortable sitting in the examination room. Tr. 522. Plaintiff was able to squat to about 45 degrees, but complained of leg and back pain. He was able to tiptoe walk and heel walk. Dr. Perry identified five anterior and four posterior positive trigger points. Tr. 524. Motor strength was 5/5 in the upper and lower extremities bilaterally. *Id.* Dr. Perry found no limitation in the ability to grip, hold objects, grasp and manipulate. Dr. Perry diagnosed possible fibromyalgia, noting "the claimant exhibited a significant amount of pain with various movements and these movements yielded pain that was totally out of proportion with the physical findings on examination and based on the claimant's history such as doing yard work and other things." Tr. 525. Dr. Perry concluded Plaintiff was able to stand and walk up to six hours, sit without limitation, with a maximum lifting and carrying capacity of 20 pounds occasionally and ten pounds frequently. *Id.* He could occasionally kneel, crouch, and crawl, and was limited if working with heavy machinery.

16- FINDINGS AND RECOMMENDATION

On August 8, 2012, Plaintiff reported the trigger point injections were helpful, but he had lost his insurance and could not afford more of them. Tr. 572. Dr. Albanese noted no pain behavior. Tr. 573. Plaintiff asked to reduce the dosage of his narcotics because of the expense and because he was feeling better on Cymbalta. Tr. 572.

On September 9, 2012, Dr. Willey wrote to the ALJ, stating he was basing his opinion that Plaintiff remained medically disabled from work on his multiple musculoskeletal problems which contribute to severe pain with exertional physical activities. Tr. 533. He wrote:

> He has had cervical surgery and fusion, with subsequent evidence of foraminal narrowing resulting in radiculitis that affects his ability to reach and lift. He has had chronic shoulder problems, which contribute to this as well. He has had chronic low back pain, as well as bilateral foot problems; neuroma surgery on the right side and CT documented arthritis and alignment abnormalities on the left side. The pain in his feet limits his ability to stand and walk for extended periods of time.

*Id.*

Dr. Willey wrote that Plaintiff was treated by a chronic pain specialist, and was on medications that cause sedation, potentially causing problems in the workplace. *Id.*

Dr. Willey completed a Medical Source Statement indicating Plaintiff could occasionally lift and carry up to ten pounds, could sit for two hours at a time for a total of four hours in a day, stand for one hour at a time for a total of two hours in a day, and walk for one hour at a time for a total of two hours in a day. Tr. 534-35. He wrote that Plaintiff could occasionally reach overhead or do other reaching, with either hand, and only occasionally push and pull. Tr. 536. Plaintiff could continuously handle, finger and fee. Dr. Willey wrote that Plaintiff should never be exposed to unprotected heights, and only occasionally be exposed to moving mechanical parts, operating a

17- FINDINGS AND RECOMMENDATION

motor vehicle, humidity, and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, heat

and vibration. Tr. 538.

## II. Testimony at September 14, 2010 Hearing

Plaintiff testified that he had one year of apprenticeship training as an electrician, but did not

complete his training because his "back went out and wouldn't let me continue." Tr. 108. He lost

his job as a delivery driver of house parts when he was laid off ostensibly due to the economy. Tr.

109. Plaintiff stated he thought the employer had tried for years to get rid of him because of his back

problems. When he was laid off he was not having any trouble performing the job. Tr. 116. He

would load boxes on a hand cart and deliver them. If the boxes were too big he would get help. *Id.*

Plaintiff stopped treatments with Dr. Dunn because the injections were not helping and they

were too expensive. Tr. 111. He had applied for many jobs. Tr. 116.

Plaintiff testified that the main reason he could not work were the muscle spasms in his back

"all day long. You never know when they're going to come or when they're going to go." Tr. 117.

Plaintiff testified that pain "sometimes, literally, drives me to my knees." *Id.* The pain may occur

once or twice a day, or as often as six to eight times. He has had muscle spasms when carrying his

wife's purse and when carrying an iced tea. Tr. 118. The spasms occur across the very low back and

the top of the buttocks and on his left side where he has a constant knot. *Id.* They last a few seconds

to several minutes. When they occur he stops whatever he is doing. Tr. 119. He has constant pain

on his left side. It's like "a charley horse, imagine that, you know, intensified maybe ten times." *Id.*

Sometimes the spasms are like "somebody taking a hammer and pounding six or seven nails into my

back at once." *Id.*

The constant dull pain interferes with his ability to do woodworking. If he extends his arms

away from his body he has constant pain. Tr. 120. The low back pain and the severity and frequency of the spasms has gradually worsened since he stopped working. *Id.* Within six months of stopping work his condition was two to three times worse than it had been. Tr. 121.

Plaintiff testified he has shooting pain down his left leg to the knee three or four times a month. Tr. 121. Sometimes his foot catches and he stumbles. He has pain down the left arm into the forearm. His arm "tightens up like a knot." Tr. 122. His three middle fingers have tingling and numbness, caused by a bulging disc in his neck. *Id.* He has carpal tunnel syndrome in his left hand. If the tingling and numbness get worse than the two to three weekly occurrences, he would get surgery. Tr. 122-23.

Neurotonin helps with neck pain. Tr. 123. He has neck pain once or twice a month. Plaintiff's foot and shoulder are not "big issues" compared to the back and neck issues. Tr. 124.

Plaintiff spends his time watering the yard and taking care of the plants. Tr. 126. If his back allows him, he tries to do some woodworking. He is building a tape dispenser and stripping the frame of an antique mirror. In a typical week his back pain is so bad that he is able to woodwork for one half hour at a time about three times. Tr. 127. When he became unemployed, he could woodwork for twice as long. *Id.* Most of the projects require him to stand. Tr. 128. His wife helps him lift heavy things.

When his back is in spasm, Plaintiff cannot lift any weight from the floor. *Id.* He does not have enough stamina to work 40 hours a week. Tr. 129. He would have to start at 20 hours a week. Considering his daily pain, Plaintiff doubts he could work 40 hours a week. *Id.*

### III. Testimony at December 12, 2012 Hearing

Plaintiff, his counsel, and a VE testified. Plaintiff testified he was 50 years old and a high

school graduate. Tr. 69. He had not worked during the two years since the first hearing. He no longer saw Dr. Jones or anyone else regarding his left foot. Tr. 72. Dr. Willey was his primary care physician, and he also saw Dr. Albanese. 72-73. Plaintiff had no health insurance. Tr. 73.

Plaintiff testified that during the work assessment at Goodwill Industries he went through racks of clothing to close zippers and button buttons. Tr. 76. Working with his arms in front of him caused back pain. Tr. 76. Another task was to put small toys onto a table "and then sort through and put like toys together for – so they could resell them." *Id.* A third task was to pick cassette tapes or compact disks out of a bin and check to be sure they were correctly labeled. Plaintiff did the work for two days, four hours a day, and on the third day he saw his doctor who took him off the job for two days. He returned the following Monday and tried to do the clothing again, but could not do it. Tr. 77. At all the tasks, he worked 15-20 minutes and then did something else so he wasn't making the same motions. *Id.* He cannot lift anything with his left arm without pain. Tr. 79.

Plaintiff's left foot small toes go numb three-to-four times a week. Tr. 80. He walks about two miles, slowly, about three times a week. Tr. 81. Dr. Albanese wants to see him every other month, but he has no insurance and goes about every three months. Tr. 82. He does woodwork projects but can only work 15 to 20 minutes at a time. Tr. 84. Plaintiff's pain has increased in intensity and frequency since the last hearing. Tr. 85. He has shooting and stabbing pain in his left leg. *Id.* He has muscle spasms in the low back. He has a bulging disc in his neck which causes headaches and ringing in the ears. Tr. 86. His doctor told him he would have to live with the pain for the rest of his life. *Id.* He puts his legs up to relieve pressure. He has a recliner with a massage function that he uses almost every day, for 30 to 45 minutes. Tr. 86-87. He does some yard work, including weeding, for about thirty minutes at a time, with about a five minute break Tr. 87-88.

20- FINDINGS AND RECOMMENDATION

The VE testified that a hypothetical person, able to lift and carry 20 pounds occasionally and 10 pounds frequently, able to walk or stand about six hours in an eight hour workday, able to push and pull limited to the weights indicated, who can should never climb ladders, ropes, and scaffolds, can occasionally climb ramps and stairs, and can occasionally stoop, crouch, and crawl, can frequently balance and kneel, with no manipulative, visual or communicative limitations, who should avoid extreme cold, vibration, and hazards, including machinery and heights, would be unable to perform Plaintiff's prior work.   Such a hypothetical person would be able to perform work as a photocopying machine operator, an office helper, or a mail clerk.  Tr. 92-93.

## DISCUSSION

Plaintiff contends the ALJ erred by (1) finding Plaintiff less than fully credible; (2) failing to credit the opinion of the treating physician; and (3) failing to show Plaintiff retains the ability to perform other work in the national economy.

### I. Credibility

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007).  When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen,* 80 F.3d at 1282.

Second, "if the claimant meets the first test, and there is no evidence of malingering, '" the

ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter,* 504 F.3d at 1036 (quoting *Smolen,* 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir. 1995)(citing *Bunnell v. Sullivan,* 947 F.2d 341, 345-46 (9th Cir. 1991)(*en banc*)).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and the observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen,* 80 F.3d at 1284. The Commissioner recommends assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms. *See* SSR 96-7p, *available at* 1996 WL 374186.

Further, the Ninth Circuit has said that an ALJ also "may consider...ordinary techniques of credibility evaluation, such as the reputation for lying, prior inconsistent statements concerning the symptoms...other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen,* 80 F.3d at 1284.

22- FINDINGS AND RECOMMENDATION

The ALJ found Plaintiff not fully credible as to the intensity, persistence, and limiting effects of his symptoms, citing inconsistencies between Plaintiff's allegations and the objective findings, evidence of exaggeration of symptoms, and inconsistencies between Plaintiff's allegations and his daily activities. Tr. 26.

## A. Inconsistencies Between Plaintiff's Allegations and the Objective Findings

### (1) Hand Symptoms

The ALJ noted Plaintiff's diagnosis of carpal tunnel syndrome and that Plaintiff did not pursue further treatment, suggesting the symptoms were not very limiting. Tr. 26. The ALJ cited Dr. Perry's report of no limitation in the ability to grip, hold objects, grasp, and manipulate. Tr. 26, 524.

Plaintiff testified that two-to-three times a week he has numbness and tingling in three middle fingers of his left hand, when he is unable to use his hand because he cannot feel his fingers. Tr. 121-23. He believes the bulging disk in his neck also causes some of his hand symptoms. *Id.* Dr. McGirr recommended surgery when the symptoms occurred daily. Tr. 122. Plaintiff's allegations regarding his hand limitations are consistent with the objective medical evidence and are not a reason to find him less than fully credible.

### (2) Lumbar Pain

Plaintiff alleges constant lumbar pain. Tr. 83. The ALJ properly noted the imaging shows only a "minimal L4-5 foraminal disc bulge which does not encroach on any nerve roots." Tr. 26, 591. There was "[n]o significant spinal stenosis or foraminal narrowing." Tr. 509.

The ALJ stated that Dr. McGirr found the lumbar MRI did not correlate with the degree of Plaintiff's back pain. Tr. 26. The ALJ is referring to Dr. McGirr's December 2009 chart note that

a lumbar MRI showed minimal degenerative changes that did not correlate with the degree of back pain Plaintiff was suffering. Tr. 451. Dr. McGirr said the MRI showed mild right-sided facet disease, and "it was so minimal on imaging that surgical treatment would not be indicated as a treatment for the back pain that he is feeling." Tr. 451. The ALJ properly noted that Dr. McGirr stated his chart notes prior to December 2009 contained "no notes specific to his low back." Tr. 26, 451. This inconsistency between Plaintiff's allegation of constant lumbar pain and the medical evidence is a specific, clear and convincing reason to find Plaintiff less than fully credible.

### (3) Fibromyalgia

The ALJ stated that fibromyalgia was not diagnosed by a rheumatologist, and Plaintiff did not exhibit the required minimum of trigger points. Tr. 26. The Commissioner concedes that the ALJ inconsistently identified fibromyalgia as a severe impairment at step two. Def. Brief at 5. Consequently, this is not a specific, clear or convincing reason to find Plaintiff less than fully credible.

### (4) Surgeries Have Been Successful

The ALJ wrote that surgeries for Plaintiff's shoulder, neck, and feet impairments, and medications, have generally been successful in relieving Plaintiff's symptoms. Tr. 27. Plaintiff testified that his foot fusion was successful, but he continues to have numbness in two toes, and three to four times a week they hurt and he massages them. Tr. 80-81. The surgery limited the range of motion in his foot and he cannot walk as far as he used to. *Id.*

Plaintiff testified that Neurontin relieves much of his neck pain, but two or three times a week he has pain and tightness radiating down his left arm with numbness in three fingers of the left hand. Tr. 121-23. The ALJ noted Plaintiff's January 2009 report of "significant improvement" in

24- FINDINGS AND RECOMMENDATION

neck pain with Gabapentin. Tr. 27, 428. In April 2009 Plaintiff had normal range of motion and no objective weakness. Tr. 27, 453.   The ALJ also noted Plaintiff had not sought treatment for shoulder pain for some time. Tr. 27. Plaintiff did "remarkably well" after shoulder surgery in April 2006. Tr. 27, 357.   By August 2006 Plaintiff was chopping wood and "doing great." Tr. 356.

The ALJ reasonably found that Plaintiff's success with treatment and election not to seek further treatment are specific, clear and convincing reasons to find Plaintiff less than fully credible.

## B. Exaggeration and Efforts to Impede Testing

The ALJ found Plaintiff's exaggeration and poor effort on testing undermined the credibility of his subjective complaints. This is a valid reason to discount a Plaintiff's credibility. *Chaudhry v. Astrue,* 688 F.3d 661, 671 (9th Cir. 2012).   The ALJ cited Dr. Perry's observation that Plaintiff reported "pain that was totally out of proportion with the physical findings on examination and based on the claimant's history such as doing yard work and other things." Tr. 27, 525.

The ALJ cited the physical capacities evaluation in August 2010, by Physical Therapist Christina Karcher. Tr. 27, 485-91. Ms. Karcher noted Plaintiff demonstrated "magnification behavior" and put forth less than full effort. Tr. 27, 491. She stated Plaintiff's material handling limits were due to self-limitation due to reported pain, which did not appear to have any specific trigger pattern but occurred with random motions.   Tr. 492. Plaintiff displayed inconsistent functional abilities on strength testing. For example, during squat testing he was limited to half-depth, but on functional lifting testing Plaintiff was able to complete a full squat. *Id.*   On range of motion testing Plaintiff did not elevate his arms above 85-90 degrees, but during cross-testing, lifting trials and general observation, he was able to elevate his arms up to 130 degrees bilaterally.   *Id.*

Plaintiff argues that Dr. Dunn, the treating pain specialist, noted no excessive pain behavior

in January 2010. Tr. 461. Plaintiff notes his primary care physician, Dr. Willey, has not reported exaggeration.

However, examining physician DeWayde C. Perry, M.D., found Plaintiff reported "pain that was totally out of proportion with the physical findings on examination and based on the claimant's history such as doing yard work and other things." Tr. 525. Dr. Perry conducted a complete physical examination and found Plaintiff's muscle strength, bulk and tone was 5/5 in the upper and lower extremities bilaterally. Tr. 524. Plaintiff notes that Dr. Perry examined him for only 30 minutes, but that is not a valid reason to find Dr. Perry's observations invalid. Finally, Plaintiff argues that Ms. Karcher is not an "acceptable medical source, " which is true, but she is not offering a medical opinion, rather she is conducting tests of physical capacity and recording her observations, and Plaintiff's argument does not discredit Ms. Karcher's observations.

Plaintiff argues that discrediting Plaintiff's subjective complaints due to exaggeration, magnification behaviors, and efforts to impede testing is the same as discrediting complaints because they are in excess of objective findings. To the contrary, indications that a claimant is limiting his efforts on testing, evidenced by inconsistent performance between direct-testing and across-testing, is not the same as discounting pain testimony due to lack of medical evidence.

The ALJ's determination to give greater weight to the observations of Dr Perry and Ms. Karcher that exaggeration and poor testing efforts undermine Plaintiff's credibility is specific, clear, and convincing, and the ALJ's reliance on those observations is reasonable even though the treating physicians did not note evidence that Plaintiff exaggerated or attempted to impede testing.

## C. Activities of Daily Living

The ALJ found Plaintiff's daily activities are not limited to the extent to be expected in light

of his complaints of disabling symptoms and limitations. Tr. 27. He stated that Plaintiff takes care of his personal needs, prepares simple meals, washes dishes, irons his shirts, shops, drives, and does yard work including weeding, planting, and mowing the lawn with a riding mower. Plaintiff did landscaping, woodworking, and walked regularly for exercise for two to three miles three or four times a week. Tr. 28.

Plaintiff argues his activities are limited and interrupted. He does woodworking if his back is not too painful. Tr. 126. He refinished a sideboard over a period of two and a half years working in periods of 15 to 20 minutes. Tr. 84. In two weeks he had been able to do woodworking for about three hours, a half hour at a time. Tr. 127. Plaintiff contends this activity is consistent with his allegation that he is unable to work on a sustained, competitive basis.

Plaintiff cites his testimony that he walks slowly. Tr. 81. He stops to 'pop' his back at least twice during a walk. He testified at the hearing that he can weed for half an hour if he takes breaks. Tr. 87-88. However, he also reported working on the side of a hill landscaping for two days in May 2011. Tr. 28, 545. The ALJ found Plaintiff's conflicting reports of his own activities inconsistent with his allegations of disabling symptoms and limitations.

The ALJ provided several valid reasons to find Plaintiff not credible, and each is supported by substantial evidence. *Tommasetti*, 533 F.3d at 1039. On this record, the ALJ identified specific, legitimate, clear and convincing reasons to find Plaintiff less than fully credible as to the extent of his symptoms. The ALJ's credibility finding should be upheld.

## II. The Medical Evidence

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). If no conflict arises between medical source opinions, the ALJ generally must accord

greater weight to the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007). In such circumstances the ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may reject it only for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart,* 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn,* 495 F.3d at 632; *Widmark,* 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark,* 454 F.3d at 1066 n.2. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

The ALJ noted treating physician Willey's multiple assertions of disabling limitations, stating:

> In October 2009, Dr. Willey felt the claimant could not do consistent work if it involved any repetitive lifting, gripping or reaching, at least until further evaluation by a neurosurgeon....In July 2010 Dr. Willey indicated the claimant should not do any lifting over 20 pounds or repetitive bending at the waist, or bending to lift. [Citation omitted]. In September 2010, Dr. Willey felt the claimant was unable to work because his pain was exacerbated by bending, carrying, lifting, pushing, pulling, reaching and prolonged standing and walking. He felt the claimant needed to be able to lie down for periods and could not return to heavy physical work. [Citation omitted]. In July 2011, Dr. Willey reported fibromyalgia added an additional barrier to the

28- FINDINGS AND RECOMMENDATION

claimant's ability to return to work. [Citation omitted]. In March 2012, Dr. Willey noted the claimant's ongoing limitations make him unable to return to his 'customary employment' and his 'potentially' sedating medications make most workplaces not a realistic option. [Citation omitted]. In April 2012, Dr. Willey reported the claimant had a combination of musculoskeletal problems rendering him unable to work, including problems with his neck, mid back, low back, shoulders and feet. He noted his pain worsened with any prolonged positioning and imaging had revealed ongoing disc problems in his spine. He felt the combination of activity limiting pain and required medications to deal with his pain medically disabled the claimant. [Citation omitted].

In September 2012, Dr. Willey filled in a medical source statement regarding the claimant's ability to do work related activities. Overall, he felt the claimant was disabled from work due to his multiple musculoskeletal problems contributing to his severe pain with exertional physical activities that were part of his customary employment. He based his opinions on foraminal narrowing of the claimant's cervical spine resulting in radiculitis affecting his ability to reach and lift, and his chronic shoulder, low back and bilateral foot problems. He also felt the claimant's medications were sedating and could cause a problem in the workplace. Yet, Dr. Willey qualified his responses by noting he felt some of the claimant's limitations would be best addressed by a physical capacities examination. Dr. Willey opined the claimant could lift an carry up to ten pounds occasionally and frequently. He felt he could sit up to two hours at a time for up to four hours in a workday and stand and walk up to one hour each up to two hours each in a workday. He felt he only occasionally reach, push or pull, and continuously handle, finger and feel. He felt he could only occasionally tolerate foot controls. He also felt he could frequently balance and only occasionally climb stairs and ramps, stoop, kneel, or crouch. He felt he could rarely crawl and never climb ladders or scaffolds. He also felt he should never be exposed to unprotected heights and could only occasionally be exposed to all other environmental limitations.

Tr. 29.

The ALJ gave Dr. Willey's opinions "limited weight." Tr. 30. The ALJ said Dr. Willey's opinions were inconsistent with his own records, citing Dr. Willey's October 2008, opinion that

29- FINDINGS AND RECOMMENDATION

Plaintiff could not work, but on examination found bilateral upper and lower extremity normal strength, sensation and reflexes, and negative straight leg raises. Tr. 29-30, 426. Dr. Willey's notes document that, aside from complaints of tenderness, Plaintiff has presented with unremarkable physical examination, negative straight leg testing, generally normal strength, sensation, and reflexes, with normal neurologic examinations.  Tr. 27, 447, 479, 563, 560.  The normal findings on examination contrast with Dr. Willey's assessment of severe limitations, like the inability to stand for more than two hours in a day.  Inconsistencies between treatment notes and opinions are a valid reason to reject a physician's opinion regarding limitations. *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008).

The ALJ noted that Dr. Willey's opinion regarding Plaintiff's limitations are based on Plaintiff's subjective complaints rather than the doctor's findings on examination. Tr. 29.  An ALJ may discount a doctor's opinion based on a claimant's subjective complaints where, as here, that Plaintiff has been found not fully credible. *Id.*  Dr. Willey acknowledged that he based his opinion on musculoskeletal problems that "result in severe pain." Tr. 533.  The distinction between Dr. Willey's normal findings on examination and his assessment of "severe pain" indicates the doctor relied on the Plaintiff's subjective reports.

Plaintiff contends that Dr. Willey based his opinion in part, on Plaintiff's history of cervical fusion with subsequent evidence of foraminal narrowing resulting in radiculitis that affects Plaintiff's ability to reach and lift. Tr. 533.  However, this evidence does not support the balance of the extensive sitting, walking, and standing limitations Dr. Willey found.

The ALJ properly noted Dr. Willey's suggestion that some of the measurements and questions the ALJ asked should be addressed by a physical capacities examination. Tr. 30, 533. Dr.

Willey's opinion was contradicted by the opinion of Dr. Perry. Tr. 521-31. The ALJ gave Dr. Perry's opinion "great weight." Tr. 30. Dr. Perry evaluated Plaintiff in response to the "chief complaint" of fibromyalgia. Tr. 521. He reviewed a limited number of records but knew Plaintiff had undergone foot surgery, rotator cuff surgery, a C6-C7 fusion, and left wrist surgery. Tr. 522. Plaintiff reported his subjective pain "was increased by nothing in particular." Tr. 521. Dr. Perry completed a full physical examination. Tr. 522-25.

The ALJ's determination to give greater weight to the examining physician than the treating physician is supported by specific and legitimate, and clear and convincing reasons, and should be found to be supported by substantial evidence.

## III. Step Five

Plaintiff argues the ALJ improperly assessed his residual functional capacity and accordingly erred at step five. The "residual functional capacity is the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ's residual functional capacity finding and hypothetical were proper because, as set out above, they included those limitations for which there was support in the medical record. Because the ALJ posed a hypothetical question to the vocational expert that incorporated the residual functional capacity assessment, based on substantial evidence, the vocational expert's testimony is substantial evidence for the ALJ's step five finding, and that finding should be affirmed.

## RECOMMENDATION

For these reasons, the decision of the Commissioner should be affirmed and this matter should be dismissed.

## SCHEDULING ORDER

31- FINDINGS AND RECOMMENDATION

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no Objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If Objections are filed, a response to the objections is due fourteen (14) days after being served with a copy of the Objections, and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 6th day of November, 2015.

John V. Acosta
United States Magistrate Judge

32- FINDINGS AND RECOMMENDATION